U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

APR I I 2012

CLERK, U.S. DISTRICT COURT
by_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MARK BARNES, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | NO. 4:11-CV-335-A |
| | § | |
| TANDY LEATHER COMPANY, LP, | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

ORDER

After having reviewed the document filed in the above-captioned action on January 24, 2012, titled "Joint Motion for Certification of Settlement Class and for Preliminary Approval of Class and Collective Action Settlement and of Settlement Class," and related documents, the court has concerns relative to the proposed settlement and settlement documents. The court is not detailing all of the concerns in this order, but is discussing the ones considered by the court to be the most serious, with the thought that when there has been a resolution of the serious concerns the others can better be defined and addressed.

1.

The Scope of the Discharges of Liability
Contemplated by the Settlement

The relief sought by plaintiffs, on behalf of themselves and others similarly situated, in Plaintiffs' Second Amended Collective and Class Action Complaint ("Complaint") filed January

18, 2012, is based on a listing of rather clearly defined alleged wrongs committed by defendants against current and former store managers employed by defendants at any time since November 23, 2008, "to the present." In contrast, the discharges of liability contemplated by the proposed settlement documents is wide-ranging, amounting to discharges of liability of defendants and many other related entities arising from virtually any kind of claim that might exist by reason of any interaction or relationship that ever existed between any of those current or former store managers, on the one hand, and defendants, or any of those entities, on the other.

The proposed agreement titled "Settlement Agreement and Agreement to Settlement Class Between Plaintiffs and Defendants, Tandy Leather Company, LP and The Leather Factory, LP" ("Agreement"), defines, in a general way, the claims that are to be released as part of the proposed settlement as follows:

> Q. *"Released Claims"* means any and all causes of action, claims, charges, damages, liquidated damages, lawsuits, causes of action, liabilities, obligations, promises, sums of money, agreements, representations, controversies, disputes, suits, rights, demands, sanctions, penalties, private attorney general actions, costs (including attorneys' fees), and expenses of any nature whatsoever against the Released Parties (defined below) by any member of the Settlement Class who signs and returns a Consent to Join/Class Action Claim Form,

or Class Action Class Member who does not sign and
return an Exclusion from Class Action Form. . . .

Agreement at 7, § I.Q.  The quoted language is followed in the
Agreement by the words "[t]he released claims include, but are
not limited to, claims arising out of or related to," which, in
turn, are followed by language that, were it not for the general
language that preceded it, and, if the word "are" replaced the
"include, but are not limited to" language, would narrow the
scope of the discharges of liability to some extent, but even as
narrowed the release language would go well beyond the scope of
the relief sought by the Complaint.[1]

The term "Released Parties" is defined to mean defendants
and "any of their subsidiaries, parent or related operating
entities, partnerships, affiliated companies, successors and
assigns and each and all of its or their partners, owners,
officers, directors, employees, managers, agents, benefit plans,
benefit plan fiduciaries, attorneys or representatives." Id. at
9, § I.S.

Under the subheadings "Release," "Covenant Not to Sue," and
"Full Release," the Agreement says:

> 1.  *Release*.  Upon occurrence of the date of
> Order and Final Approval (as defined below), and in

---

[1] The wording of paragraphs E and F, and in other parts of the "Recitals" on pages 1-4 of the
Agreement misleadingly suggests that only claims asserted in the Complaint are to be discharged.

3

consideration of the valuable considerations set forth
in this Settlement Agreement, the Releasing Parties
shall be deemed to, and by operation of the Order and
Final Judgment shall have, hereby fully, finally and
forever released, relinquished and discharged the
Released Parties of and from any and all Released
Claims that they ever had, now have, or may have in the
future pertaining to events or actions through the date
of the Court's Order and Final Judgment.

>    2.   *Covenant Not to Sue*.   The Releasing
> Parties covenant not to sue any Released Party for any
> transaction, event, circumstance, action, failure to
> act, or occurrence of any sort or type arising out of
> or related to the Litigation or the Released Claims.
> This Section shall not apply to any action to enforce
> this Settlement Agreement.

>    3.   *Full Release*.   The Parties to this
> Agreement expressly agree and acknowledge that the
> Released Claims described and set forth in Section
> I.Q., and the covenant described and set forth in
> Section II.A.2., constitute a full and final release by
> the Releasing Parties of the Released Parties.

Id. at 10, § II.A.1.-3.

The term "Releasing Parties" is defined in the Agreement to
mean the named plaintiffs, any class member who has submitted a
Consent to Join Class Action Claim Form, and any who has not
excluded himself or herself from the class.   Id. at 9, § I.R.

Language on page 11 of the Agreement takes the broad nature
of the discharge of liability contemplated by the Agreement a
step further by assuring the Released Parties that they will be
discharged of all liability to the Releasing Parties for claims
within the broadly defined "Released Claims" even if the

4

Releasing Parties do not know or suspect that they have the claims.[2]

The Agreement contemplates that "[i]f [the] Agreement is preliminarily approved by the Court and after the deadline for submission of the Consent to Join/Class Action Claim Form and the Notice of Exclusion From Class Action Form," id. at 20, the parties shall jointly seek entry of an order and final judgment that, inter alia:

> e.   orders that the Releasing Parties are permanently enjoined and barred from instituting, commencing, or prosecuting any action or other proceeding asserting any of the Released Claims released in Section I.Q. against any Released Party, either directly, individually, representatively, derivatively, or in any other capacity, by whatever means, in any local, state, or federal court, or in any agency or other authority or arbitral or other forum wherever located;

Id. at 20-21, § II.D.5.e.

The proposed "Notice of Pendency of Class and Collective Action Lawsuit and Proposed Settlement" ("Notice") contains Release of Claims language that appears to be as broad as the language contained in the Agreement.  Notice at 12-13 (App. at 45-46).  Yet, the Notice misleadingly says that only "Tandy" will be released of claims.  Id. at 6 (App. at 39).

---

[2]The wording of the "Waiver" subparagraph on page 11 is internally inconsistent.

For some reason that is not explained, the "Release of Claims" language contained in the proposed document titled "Consent to Join Collective Action, Class Action Claim Form, and Release" ("Consent") is not as broad as the release language contained in the Agreement or the description of the release contained in the Notice.  Consent at 3 (App. at 53).  The language in the Consent does not have the virtually unlimited release language used in the Agreement and in the Notice. However, even if the discharges of liability of the Released Parties by the putative class members were to be limited by the language contained in the Consent, the language nevertheless would appear to be much too broad, bearing in mind the limited nature of the claims alleged in the Complaint.  Moreover, the Release language in the Consent is inconsistent with the language in the other documents.

The thought occurs to the court that the discharges of liability should be limited to the defendants, Tandy Leather Company, LP and The Leather Factory, LP, and that the claims affected by the discharges of liability should be limited to those described in the Complaint.  Otherwise, (1) there is tremendous potential for confusion on the part of the putative class members as to what liability claims they are releasing if

they subject themselves to the settlement[3] and (2) there is no way the court can evaluate the fairness of the settlement if the precise claims of each of the putative class members that are being discharged by the settlement cannot be identified and are not subject to valuation. The court does not consider that a proper use of a class action settlement is to obtain discharges of liability of defendants and another group of persons beyond those named as defendants of a broadly, generally defined, group of claims that are far beyond the scope of the claims that are the subject of the class action litigation.

2.

### Dismissal of Claims/Lawsuit

The Agreement contemplates that when the court has approved the settlement procedures other conditions will occur, including "the prompt, complete, and final dismissal with prejudice of the Lawsuit as to the Released Parties" before subsequent steps in consummation of the settlement can take place. Agreement at 17, § II.D. On page 22 of the Agreement, language again is used indicating that an essential step of consummation of the settlement includes "dismiss[al of] the Lawsuit as against all

---

[3]The Notice misleadingly says that "[t]he proposed settlement will resolve all claims in the lawsuit," Notice at 2 (App. at 35), not mentioning the wide-ranging release language in the Agreement. The same kind of misleading language is used in the last sentence on page 5 (App. at 38) of the Notice and the first paragraph on page 6 (App. at 39) of the Notice.

Released Parties with prejudice . . . ." Id. at 22, § II.D.8.
Performance of the condition to the settlement of an order
"dismissing the Lawsuit as against all Released Parties with
prejudice" is impossible because only two of the "Released
Parties" are parties to the lawsuit who can benefit from its
dismissal.

3.

Identities of Class Members and the
Benefits From the Settlement
Versus Benefits From Successful Litigation

Before the court could even preliminarily approve the
settlement, the court would need more information about the
putative classes ("FLSA Class" and "State Law Class", Compl. at
6), and the benefits each member would receive from the
settlement compared to what each member would receive if the
litigation were to be successful. See Ortiz v. Fibreboard Corp.,
527 U.S. 815, 849 (1999). The information the court requires is:

(a)   The name, current address (to extent known) of
each putative class member in each class (separately listed)
and the identity and location of each store at which he or
she served as a store manager for defendants at any time
from November 23, 2008, to the present, with the beginning
and ending dates of employment in that capacity at each such
store;

(b)   The dollar amount each putative class member would receive, given separately as to each class, out of the proposed settlement proceeds if all class members were to participate as members of both classes in the sharing in those proceeds; and

(c)   The estimated dollar amount each putative class member would receive, given separately as to each class, if all class members were to participate as members of both classes and if plaintiffs were to be successful in the requests for relief they have made in the Complaint.

Mr. Thierman's declaration suggests that he already has access to the information that would be required to satisfy the court's needs, as outlined above. Thierman Decl. at 2-4 (App. 73-75), ¶¶ 11, 12, 15.

4.

### Bonus (or Independent Cause of Action) Payments to Plaintiffs

The Agreement contemplates payments to the named plaintiffs to be deducted from the agreed-upon settlement amount before the net amount is disbursed to the putative class members.  Barnes would receive $34,000.00, Cavota $7,500.00 and Mercante $7,500.00.  Presumably each of them would, in addition, receive a share of the net settlement proceeds, based on the plan of

distribution described in the Agreement, as part of the distribution to the class.  The thought occurs to the court that it should not preliminarily approve a settlement that contemplates payments of that kind to the plaintiffs without significantly more information than the court has.  The court would need to be satisfied that other members of the putative class do not have a reason or reasons as valid as those of the plaintiffs for receiving special compensation for some claim they might have against one or more of the released parties that would be discharged as part of the settlement.  Perhaps the wisest course would be for all of the putative class members of each class to share in the settlement proceeds on a uniform basis, with the thought that any claims that are not part of the collective or class action claims can be dealt with by the parties separately, after full disclosure to the court and putative class members.

5.

Attorneys' Fees

The proposed Agreement contemplates that counsel for the plaintiffs would receive out of the settlement proceeds attorneys' fees in the total amount of $215,946.67.  Needless to say, before the court considers preliminary approval of the settlement, the court will need to have detailed information

10

concerning work done by counsel on behalf of plaintiffs and the putative class in pursuit of class action claims, including an itemization (by type of work done, time devoted to each item of work, date when work was done, and name of attorney who did the work) of all work done, the normal per-hour rate for each attorney, and whatever other information would be appropriate to assist the court in evaluating appropriateness of the proposed fee amount.

6.

### Rule 23 and § 216(b) Prerequisites

In <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997), the Supreme Court ruled that, while the fact of settlement is proper to be considered in evaluating whether there should be a certification for settlement purposes only, the requirements of Rules 23(a) and (b)(3) must be established as a condition to making a certification even for that limited purpose. Thus, there is an issue as to whether the claims of the representative parties (the named plaintiffs) are typical of the state law claims of the putative class and whether they will fairly and adequately protect the interests of the class. To qualify for the opt-in FLSA Class, the employees must be "similarly situated" to the employee who brought the court action.

11

A relevant consideration is whether each of the claims described in the Complaint as collective or class action claims is a claim being asserted by at least one of the representative parties on his or her own behalf.  The claims are listed on pages 1 and 2 of the Complaint, are separately described in each of the numbered causes of action, and are listed again on pages 16-17. The court needs information showing as to each representative party the claims enumerated in the Complaint that are being asserted by that party on his or her own behalf as well as on behalf of others similarly situated.  If any of the claims that are described in the Complaint are not being asserted by any class representative on his or her own behalf, the court would have a concern as to whether the claims of the representative parties are typical of all the claims of the class and whether the representative parties will fairly and adequately protect the interests of the class as to all claims.

A similar concern exists in reference to lack of adequate representation by plaintiffs in the state law class of persons who served as store managers in the states of Alaska, Colorado, Connecticut, Illinois, Kentucky, Maryland, Massachusetts, Minnesota, Montana, New Mexico, New York, North Carolina, North Dakota, Ohio, Pennsylvania, Washington, and Wisconsin.  According to the Complaint, Barnes "worked at one of Defendant's stores

located in the state of Nevada and California," Mercante "worked

at one of Defendant's stores located in the state of Arizona,"

and Cavota worked at "one of Defendant's stores located in the

state of Oregon." Compl. at 6, ¶ 23. The court is concerned

whether plaintiffs' claims are typical of the claims of the

members of the putative class who worked as store managers in one

of the states other than Nevada, California, Arizona, and Oregon,

and whether plaintiffs can fairly and adequately protect the

interests of members of the putative class who managed a store in

those other states.

7.

Language Concerning "Settlement Fund" Appears
to be Confusing and Indefinite

The term "Settlement Fund" is defined in the Agreement as

follows:

> V.   "*Settlement Fund*" means the amount deposited
> by Defendants to an escrow account established pursuant
> to Section II.B.1. of this Settlement Agreement,
> including all monies held therein in accordance with
> the terms of this Settlement Agreement, including any
> interest accrued thereon.

Agreement at 10, § I.V.

When the court turns to Section II.B.1. of the Agreement,

the court finds the following language:

> 1.   *Settlement Fund*.  Defendant shall invest
> or deposit the total amount of the Settlement Fund of
> $993,385.90 in discrete and identifiable instruments

13

> backed by the full faith and credit of the United
> States Government, or fully insured by the United
> States Government or any agency thereof, and shall
> reinvest the proceeds of these instruments as they
> mature in similar instruments at their then current
> market rates. Any cash portion of the Settlement Fund
> not invested in instruments of the type described above
> shall be maintained by the Defendant, and not
> commingled with any other funds or monies, in a
> federally-insured bank within fifteen (15) business
> days after the date of Order and Final Judgment.

Agreement at 12, § II.B.1. In other words, there is nothing in

Section II.B.1. of the Agreement that mentions an escrow fund or

explains anything that could be interpreted to define an escrow

fund.

The above-quoted language from page 12 of the Agreement is

mystifying. The Agreement should have a clear definition of an

escrow fund into which the Settlement Fund is to be paid and a

definitive statement as to the identity of the escrow agent,

exactly what is to be put in the escrow account, and the duties

of the escrow agent. The parties should bear in mind that

whatever method is used for placement of the Settlement Fund

aside for use in funding the settlement should take into account

the risk that the defendant or defendants could become the

subject of a case in bankruptcy before all of the funds have been

used, and language should be used to prevent the unused funds

from becoming a part of the bankrupt estate of the debtor or

debtors in such an event.

14

Further uncertainty on this general subject is the effect and intended operation of the distribution provisions found in paragraph 5 on page 15, saying that "Tandy shall issue and provide to the Claims Administrator for distribution the appropriate checks from the Settlement Fund . . . ." The court believes that the logical process would be for an escrow agent, in possession of the Settlement Fund, to be the one to issue and provide for distribution the appropriate checks from the Settlement Fund.

8.

## Uncertainty as to Beginning and Ending Dates for Class Definitions and Damage Calculations

The Complaint and the Notice use "from November 23, 2008, to the present" as the defining time period for identifying current or former store managers employed by defendants who are putative class members. Compl. at 6, ¶ 22; Notice at 1 (App. 34). The brief in support of the joint motion for certification uses the "at any time from November 23, 2008, to the present" language as part of the definition of the FLSA Class and the State Law Class. Br. at 8-9. In contrast, the Agreement defines the FLSA Class as "all current or former Store Managers employed by Tandy at any time three years prior to the Date of Preliminary Approval . . . through the Date of Preliminary Approval . . . ." Agreement at

15

4, § I.A. The Agreement has a definition of the State Law Class that, likewise, replaces November 23, 2008, with "Date of Preliminary Approval." <u>Id.</u> at 5, § I.C. Other timing definitions in the documents appear equally uncertain and confusing. For example, the "Release" language on page 10 says that the order and final judgment shall cause a full release and discharge of the Released Parties "of and from any and all Released Claims that they ever had, now have, or may have in the future pertaining to events or actions <u>through the date of the Court's Order and Final Judgment</u>." Agreement at 10, § II.A.1. (emphasis added). But, the section having to do with Settlement Fund distribution uses a "3-year period prior to the date such individual's Consent to Join/Class Action Claim Form is postmarked and received" to measure entitlement to damages. <u>Id.</u> at 16, § I.C.5.b.

9.

### Meaning of "Authorized Claimant"

Somewhat in passing, the court notes that it cannot find in the Agreement anything defining the term "Authorized Claimant" which appears on page 14 of the Agreement. If it is defined in the Agreement, the parties should direct the court's attention to the definition. Otherwise, any revision of the Agreement should contain an appropriate definition.

16

10.

## The "Opt In" and "Opt Out" Language
## in the Settlement Documents

The court's reading of the Agreement is that the parties have in mind that the putative class members have a choice of opting in the FLSA collective action and, thereby, benefitting from the settlement as to that feature of the settlement, while, at the same time, opting out as to the state law class action, thus foregoing any benefit from the settlement as to that feature of the case and, correspondingly, preserving the right to assert a separate, independent, state law claim against either or both defendants, and vice versa. However, some of the language of the Agreement causes the court to be concerned that putative class members could think that the intent is that no class member will be permitted to participate in the settlement proceeds unless he or she has both opted in the FLSA collective action and failed to opt out of the state law class action. See Notice at 6-7 (App. at 39); Agreement at 4-5 (§§ I.A. & C.) and 15 (§ II.C.5.a.); Notice at 14-15 (§ 6) (App. at 47-48). The court believes there will have to be rewording of the documents to make it clear to the court and putative class members exactly what is intended, what has to be done to participate in the collective action but not the class action or vice versa, and what share of the

17

settlement would be received by a putative class member who elects to participate in one aspect but not the other. Perhaps the language in Section II.C.5.b. of the Agreement had that goal, but the overall wording of the documents lacks desired clarity of that subject.

11.

<u>Qualifications and Duties of Claims Administrator</u>

The Agreement identifies the "Claims Administrator" as Simpluris, Inc. The court needs enough information about Simpluris, Inc., to enable the court to evaluate its qualifications to serve as Claims Administrator. Moreover, the court is inclined to think that the settlement agreement should specifically define the duties and responsibilities of the Claims Administrator. There is discussion in Sections II.B.3., C.2. and 5. of things the administrator is expected to do; but, the court is inclined to think that there should be a more definitive statement in the settlement agreement as to the duties and responsibilities of the administrator.

The court has noted an internal inconsistency in Section II.C.5. in that the introductory paragraph in sub-subsection 5. says that "Tandy shall issue and provide <u>to the Claims Administrator for distribution the appropriate checks from the</u> Settlement Fund in accordance with the calculations determined by

18

the Claims Administrator"; yet, sub-subsection 5.a. says that "[a]fter the Court-approved deductions from the Settlement Fund, the remaining Net Settlement amount will be <u>distributed by Tandy to those members of the Settlement Class</u> who have signed and properly completed . . . ."  Agreement at 15, §§ II.C.5. and 5.a. (emphasis added).  There needs to be clarification.

12.

"Termination of Settlement" Provisions

The court questions whether the provisions in the sub-subsection titled "Termination of Settlement" on page 23 of the Agreement are workable.  For example, the provision that "all documents related to the settlement, including this Settlement Agreement and the attached notices shall be permanently stricken from the public record" is not acceptable to the court because the court would want to have discretion to decide based on the then existing circumstances whether documents would be stricken from the record if the settlement terminates.  Other parts of that sub-subsection are subject to similar shortcomings inasmuch as the court might have reasons to enter an order at variance to the provisions of the sub-subsection if the settlement is not consummated.

19

13.

## General Remarks

As the preceding parts of this order disclose, the court's evaluation of the proposed settlement documents has been a time-consuming and tedious process. Considering the court's difficulty working through the documents, the court can be reasonably certain that there will be at least some putative class members who will have difficulty gaining an intelligent understanding from the documents of the rights at stake by opting in or out or both. There may be good explanations that provide answers to some or all of the concerns expressed by the court. If there are, each of those explanations needs to be presented to the court with clarity if the court is to proceed further with the process of determining whether the proposed settlement should be preliminarily approved.

If the parties wish to proceed further with a settlement, the court suggests that they start with a redrafting of the proposed settlement agreement to the end of resolving the court's concerns, and then file the redrafted document along with another document providing the additional information needed by the court, and explaining how the redrafted proposed settlement agreement addresses the court's concerns. The court expects the parties when preparing the redrafted settlement agreement to

devote enough attention to the project to cause each provision of the document to be consistent with all the others and to ensure that the document is worded in such a way that it will be readily understood by any putative class member who elects to study it as part of his or her evaluation as to whether he or she wishes to participate in the settlement.

Once the court has the requested information, and the starting point of having a proposed settlement agreement in an acceptable form has been accomplished, the court will communicate further with the parties relative to the drafting of the remaining settlement documents to cause them to be in acceptable forms and any further requirements.

The court expects the parties to comply with the suggestions in this section 13 by May 9, 2012.

THE COURT SO ORDERS.

SIGNED April 11, 2012.

_____
JOHN McBRYDE
United States District Judge

21